NOT DESIGNATED FOR PUBLICATION

No. 114,122

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOSHUA JAMES ROBERTSON,
*Appellant*,

v.

DALE CALL, *et al.*,
*Appellees*.


MEMORANDUM OPINION

Appeal from Butler District Court; JOHN E. SANDERS, judge. Opinion filed August 19, 2016. Affirmed in part and remanded in part.

*Joshua S. Andrews*, of Cami R. Baker & Associates, P.A., of Augusta, for appellant.

*Michael J. Smith*, of Kansas Department of Corrections, for appellees.

Before POWELL, P.J., ARNOLD-BURGER, J., and WALKER, S.J.

*Per Curiam*:  This case is before us for the second time to consider whether the district court properly dismissed Joshua Robertson's K.S.A. 2015 Supp. 60-1501 petition alleging that an El Dorado Correctional Facility (EDCF) policy that prohibits face-to-face meetings between inmates and their spiritual advisors violated Robertson's rights under the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution. Because there is substantial competent evidence in the record supporting the district court's conclusion that Robertson failed to establish that his freedom to exercise his religion has been substantially burdened by the prison's regulation, we affirm the district court's decision in that regard. However, we must again remand the case to the

1

district court for it to comply with this court's prior mandate and make adequate findings for meaningful appellate review regarding Robertson's claim that EDCF also violated Robertson's rights under the Establishment Clause of the First Amendment.

FACTUAL AND PROCEDURAL HISTORY

This case is before us for the second time after it was remanded to the district court in 2015, for additional findings related to allegations made by Robertson in a petition for habeas corpus. See *Robertson v. Call*, No. 112,132, 2015 WL 326677 (Kan. App.) (unpublished opinion), *rev. denied* 301 Kan. 1047 (2015).

In his petition, Robertson alleged, among other things, that the prison's policy that prohibited face-to-face visits between inmates and their spiritual advisors violated his rights under the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution. The case was summarily dismissed by the district court in June 2014, and an appeal was filed with this court. A panel of this court affirmed in part, modified in part, reversed in part, and remanded to the district court for further consideration of Robertson's First Amendment claims. 2015 WL 326677, at *7.

On remand, the district court held an evidentiary hearing and heard testimony from Robertson, Robertson's Rabbi Richard Segal, and several prison officials. At the conclusion of the hearing, the district court determined that Robertson's First Amendment rights had not been violated and again dismissed the case. Robertson then filed this appeal.

ANALYSIS

*Robertson's First Amendment right to freely exercise his religion was not unconstitutionally impeded.*

Robertson first argues that the district court erred when it concluded that the EDFC's policy prohibiting face-to-face visits between prisoners in segregation and religious leaders of their choosing did not violate his right to freely exercise his religion. This court reviews a district court's decision on a K.S.A. 2015 Supp. 60-1501 petition to determine whether the district court's factual findings are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. The district court's conclusions of law are subject to de novo review. *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004).

When this case was before this court on appeal from a summary dismissal by the district court in 2015, this court instructed the district court to determine on remand "after hearing the testimony of witnesses, whether Robertson's ability to engage in the penitential communication he desires with his Rabbi is actually substantially burdened when it can only be done by video." *Robertson*, 2015 WL 326677, at *5. Additionally, the panel instructed that if the district court concluded that Robertson's religious practices were burdened by the EDFC's policy, it would be necessary for it to determine whether "the lessening of the experience is counterbalanced by the needs of prison personnel to maintain order, security, and discipline." 2015 WL 326677, at *5. This court concluded that remand was necessary because such findings could only be made "by the district court after it has had an opportunity to gauge Robertson's sincerity, hear evidence on the significance of face-to-face contact between Rabbi and penitent, and then balance any burden on Robertson's rights with evidence of the toll on prison administration." 2015 WL 326677, at *5. After the district court made these findings, it would be able to

"properly apply the four-factor test from *Turner* [*v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)]." 2015 WL 326677, at *5.

In *Turner*, the United States Supreme Court outlined the test for courts to use when reviewing claims by prisoners that their constitutional rights had been violated by prison regulations. The Court said that any analysis must begin with a recognition of two competing concepts. 482 U.S. at 84. First, that prisoners retain their constitutional rights during incarceration. And, second, that great deference should be accorded to prison officials to formulate and implement prison policies. 482 U.S. at 84-85. Balancing these ideas, the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89.

The Court then outlined four factors courts should consider when attempting to determine if a regulation is reasonable. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89. Additionally, this first factor requires consideration of whether the regulation is neutral—the regulation must be facially neutral and applied in a neutral manner to be valid. Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. As long as a regulation leaves open alternative means for an inmate to exercise a right, then courts should view the regulation with great deference to prison officials. Third, courts are to consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90. Again, at this stage great deference should be accorded "to the informed discretion of corrections officials." 482 U.S. at 90. Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." 482 U.S. at 90. For a regulation to pass muster under this prong of the test, it is not necessary for prison officials to "set up and then shoot down every conceivable alternative method of accommodating the

4

claimant's constitutional complaint." 482 U.S. at 90-91. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." 482 U.S. at 91.

The regulation at issue here prohibits inmates *in segregation* from having face-to-face interactions with *any* visitors. El Dorado Correctional Facility General Order 16-107(I)(C)(1). Instead, inmates are taken to a video booth located inside the segregation unit where they are able to communicate with visitors located in a video booth in a visitor area outside of the segregation unit. In the inmate booth, there is a screen so that the inmate can see the visitor and there is a phone that the inmate uses to hear and speak to the visitor. The visitor booth similarly contains a screen and telephone handset but also contains an ELMO device that can be used to show the inmate any documents that need to be shared. If the inmate actually needs to sign a document, a guard has to transport the document from the visitor's area to the inmate in the segregation area and back.

When this case was first filed, attorney visits were conducted face-to-face, albeit the attorney was separated from the client by a door and screen, while all other visits were conducted via video link. While the case was on remand from this court, the procedure changed so that attorney visits are now also conducted via video link. Warden James Heimgartner testified that the plan to eliminate all face-to-face visits had been in the works for several years. Attorney visits were the last to transition to video because of a delay in obtaining the equipment necessary for document sharing.

Heimgartner testified that anytime visitors are brought into the segregation unit and items passed back and forth, security is at risk. Not only can contraband be transferred, but the mere presence of civilians in such a highly secured segregation area, "where the worst of the worst inmates are," can present problems in ensuring their safety if problems break out on the unit. In addition, to prevent the intentional or unintentional

transfer of contraband, inmates are required to be strip searched after any such direct contact, involving significant staff time. Finally, Heimgartner stressed in his affidavit presented prior to the evidentiary hearing that one reason he did not want attorneys and clergy coming into the segregation unit was because "[t]hese events are often accompanied by vocalization of questions, comments and sometimes acting out. Access to segregation units is restricted because of the disruption that unknown individuals can cause in the unit." Moreover, at the evidentiary hearing Heimgartner expanded on his position that nonstaff should not be allowed in segregation by expressing that after visits by nonstaff, inmates were more likely to complain of medical events like shortness of breath and chest pains that took up a lot of staff time.

But before we even reach the issue of the relationship between the regulation and government justification for it, it is necessary to consider whether Robertson's right to freely practice his religion is being substantially burdened by this regulation. See *Turner*, 482 U.S. at 89; *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007); *Robertson*, 2015 WL 326677, at *5. It is only after a plaintiff has shown that a prison regulation substantially burdens his or her right to free exercise that courts must consider whether the regulation is nevertheless justified by legitimate penological interests. *Boles*, 486 F.3d at 1182.

When determining whether a regulation violates a prisoner's right to free exercise of his or her religion, it is necessary to distinguish between regulations that merely require a prisoner to modify his or her preferred method of expression and those regulations that are so burdensome that they coerce the prisoner into violating his or her religious beliefs. See *Lyng v. Northwest Indian Cemetery Prot. Ass'n*, 485 U.S. 439, 449, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988). In *Boles*, the Tenth Circuit Court of Appeals considered whether Boles met his burden of proving that a prison regulation that prevented him from wearing a yarmulke and tallit katan violated his sincerely held religious beliefs. Boles alleged in his complaint that Jewish Law required men to wear head coverings at all times and to not "'walk even as much as four cubits (approximately

6

six feet) without wearing [the Tallit Katan]'" and that following the laws was of "'cosmic or life and death importance.'" 486 F.3d at 1182. The Tenth Circuit court concluded that these allegations were sufficient evidence that the regulation violated Boles' freedom of religious expression to shift the burden to the prison warden to prove that "legitimate penological interests [were] served by his decision to forbid Boles from wearing his religious garments." 486 F.3d at 1182.

In *Wares v. Simmons*, 524 F. Supp. 2d 1313 (D. Kan. 2007), on the other hand, the court concluded that the plaintiff failed to prove that a prison regulation restricting the religious texts he was able to possess while on a disciplinary probation violated his right to free exercise. The regulation allowed Wares to possess primary religious texts but no supplemental texts that were deemed "non-essential to the practice of plaintiff's religion." 524 F. Supp. 2d at 1317. The district court considered the Tenth Circuit Court's definition of "'substantial burden' as one that: (1) significantly inhibits or constrains plaintiff's religious conduct or expression, (2) meaningfully curtails plaintiff's ability to express adherence to his faith, or (3) denies plaintiff reasonable opportunity to engage in fundamental religious activities." 524 F. Supp. 2d at 1320. The district court then determined that the restriction did not substantially burden Wares' religious practice, concluding:

> "By virtue of the other religious materials and items that plaintiff is permitted to possess and ceremonies that he is permitted to engage in [while on disciplinary probation], his religious conduct or expression is not significantly inhibited or constrained, he remains able to express adherence to his faith, and he has a reasonable opportunity to exercise his sincerely-held religious beliefs." 524 F. Supp. 2d at 1321.

Here, the district court found that Robertson's free exercise right was not substantially burdened because there was "no evidence that in-person visitation by clergy is a tenet of his faith, although he would prefer to meet face-to-face," and that "[t]here is no lessening of the religious experience by communicating with his clergy by video link."

7

These factual findings are reviewed to see if there is substantial competent evidence in the record to support the district court's conclusions.

At the hearing on remand, both Robertson and his Rabbi testified about the impact of video visits on Robertson's spiritual practices and development. Robertson testified that the primary reason he felt that the video link visitation system interfered with his ability to practice his religion is that he did not feel free to confess his sins to the Rabbi because he believed that the visits were being monitored and recorded by prison staff. Additionally, Robertson complained that it was difficult to hold his bible and the handset at the same time, making it hard to have discussions about the text, and that he would like to be able to celebrate holidays, such as Passover, with the Rabbi in person.

Rabbi Segal testified that he too was concerned with the confidentiality of the video link system, that it was difficult to teach Robertson Hebrew when they could not read from the same book together, and that he would like to celebrate religious holidays with Robertson in person. When pressed on whether these complaints represented mere preferences or whether face-to-face communication was a necessary part of Messianic Judaism, Segal responded that he believed "it's a tenet of all faiths to be face-to-face. . . . I believe spiritual faith is relationships first with God and Yeshua—Jesus. And then with the Rabbi or the pastor. Its relationships. You can't do that very well through a video." Segal concluded that, "there is something about being in the location that you cannot do through video. And so I just think that you're—you're holding back on him something that he could probably be in—be an encouragement to him, his spiritual growth."

Reviewing the testimony of Robertson and Segal, it is clear that both believe face-to-face meetings are important for Robertson's spiritual growth and development but neither is able to point to any concrete ways in which a tenet of Messianic Judaism is violated if such meetings do not take place. The testimony supports the district court's

8

conclusion that in-person meetings are preferred but are nonessential to the practice of Robertson's faith.

Even with the EDCF regulation in place, Robertson is able to engage in the practice of his religion. Robertson is still able to seek guidance from Segal, confess to him, study Hebrew with him, and even celebrate meals, though remotely, with Segal. Additionally, no element of Robertson's personal practice or study is restricted by this policy—Robertson is able to study and pray on his own and otherwise observe the teachings of Messianic Judaism.

Because there is substantial competent evidence in the record supporting the district court's conclusion that Robertson failed to meet his initial burden to prove that his freedom of exercise has been substantially burdened by the prison's regulation, we affirm the district court's decision in that regard.

*The district court failed to rule on whether the prison policy violated the United States Constitution's Establishment Clause.*

Robertson next argues that the EDCF's policy violates the First Amendment's prohibition on government establishment of religion. When before this court previously, the panel found that "the petition, files, and records of the case do not conclusively show that Robertson is not entitled to relief" on his Establishment Clause claim. *Robertson*, 2015 WL 326677, at *6. The panel reversed the summary dismissal and remanded the issue to "the district court for appointment of counsel and, if necessary, evidentiary hearing." 2015 WL 326677, at *6.

Robertson spent very little time developing this issue on remand. Nevertheless, some testimony was devoted to the issue and his attorney clarified during closing arguments that Robertson was alleging violations of both the Free Exercise Clause and

9

the Establishment Clause. This claim seems to relate to the fact that a chaplain who attended Bible College and Seminary is employed by the Kansas Department of Corrections to counsel inmates in the segregation unit at any time. In addition, a Christian ministry group, Bill Glass Ministries was allowed to walk escorted through the halls of the segregation unit and pass out Christian Bible tracts. Robertson's claim in his petition and in closing argument is that these practices result in religious coercion in violation of the Establishment Clause. Although both the parties and the district judge seem to combine the Free Exercise Clause claims and the Establishment Clause claims, they are different.

The district court's written journal entry and order did not mention the Establishment Clause claim at all. While the district court made some findings at the conclusion of the second evidentiary hearing and simply referred by name to both the Establishment Clause and the corresponding *Lemon* test, based on the U.S. Supreme Court ruling in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), the discussion was somewhat convoluted. The district court discussed the tests for finding violations of the Establishment Clause and the Free Exercise Clause as though they were interchangeable, concluded generally that Robertson's First Amendment rights had not been violated, and limited analysis to application of the facts to Robertson's Free Exercise claim.

Significantly, in his brief, Robertson does not argue that the district court erred when it ruled on his Establishment Clause claim. However, neither does Robertson mention that the district court failed to follow the mandate of this court to address the claim.

Generally, arguments not briefed by an appellant are not considered by this court. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Here, however, that policy conflicts with this courts' "inherent authority to assert

10

continuing jurisdiction to enforce its mandate[s]." *State v. Downey*, 29 Kan. App. 2d 467, 470, 27 P. 3d 939, *rev. denied* 272 Kan. 1421 (2001). When this case was first before this court, it concluded that based on the limited record before the court it was not clear whether Robertson's Establishment Clause claim was viable. The panel then "reverse[d] the district court's summary dismissal of Robertson's Establishment Clause claim and remand[ed] it to the district court for appointment of counsel and, if necessary, evidentiary hearing." *Robertson*, 2015 WL 326677, at *6.

When this court fails to give specific directions on how to address an issue on remand, district courts have discretion regarding implementation of the mandate. *Leffel v. City of Mission Hills*, 47 Kan. App. 2d 8, 15-16, 270 P.3d 1 (2011). Nevertheless, on remand district courts must address the issues "'necessary to the resolution of the case that were left open by the appellate court's mandate.'" 47 Kan. App. 2d at 16. So, while the district court here could have chosen to determine the validity of Robertson's Establishment Clause claim after asking for additional briefing from the parties rather than holding an evidentiary hearing, the district court was—absent waiver or dismissal by Robertson—obligated to develop and rule on the issue.

At this point, the district court's findings of fact and conclusions of law are so inadequate that they preclude meaningful review. Supreme Court Rule 165 (2015 Kan. Ct. R. Annot. 257) places the primary duty to provide adequate findings of fact and conclusions of law on the district court. *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013). Parties also play a role in ensuring adequate findings; they have a responsibility to object to insufficient findings in order to preserve issues for appeal. 296 Kan. at 825. But even where a party failed to object below, if the record on appeal is so deficient that meaningful review by this court is impossible, this court can remand the case for additional findings and conclusions. 296 Kan. at 825.

11

Again here, Robertson does not actually argue that the findings are insufficient and this court is not in the habit of making arguments for the parties. Nevertheless, any review of the issue is impossible because the district court failed to consider it. While a second remand is not an ideal use of the district court's time or resources, it is the only option available to this court at this time. Accordingly, we must again remand this case to fully consider Robertson's claim of a violation of his constitutional rights under the Establishment Clause.

Affirmed in part and remanded in part.